NO.
12-06-00051-CR

 

IN THE COURT OF APPEALS

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

 

 

DONALD CARL BEASON, §          APPEAL FROM THE 114TH

APPELLANT

 

V.        §          JUDICIAL DISTRICT COURT OF

 

THE STATE OF TEXAS,

APPELLEE   §          SMITH COUNTY, TEXAS

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



OPINION

            Donald
Carl Beason appeals his conviction for robbery, for which he was sentenced to
community supervision for two years. 
Appellant raises five issues on appeal. 
We affirm.

 

Background

            Appellant was admitted to East Texas
Medical Center (“ETMC”) in Carthage, Texas (“ETMC Carthage”) for an apparent
heart attack.  Appellant was treated for
a clot and was transferred by ambulance to ETMC in Tyler, Texas (“ETMC Tyler”).  There, Appellant underwent a heart
catheterization procedure and was subsequently told that he needed immediate
open heart surgery.  

            Appellant later learned that the
same doctor who performed the catheterization was also scheduled to perform
Appellant’s surgery the next morning. 
Upon receiving this information, Appellant requested a copy of his
medical records.[1]








  Appellant’s request was denied at that time
because the records department was not open and would not be open until the
next morning.  Appellant asked for his
chart containing the original records. 
Thereafter, Appellant left the hospital with his original records to
seek a second opinion elsewhere.

            As Appellant and his wife made their
way to the exit, Marilyn Renee Rolling, a hospital security guard, attempted to
stop them and seize the bag Appellant was carrying.  A scuffle ensued between Appellant and
Rolling.  Appellant and his wife left in
their car, but were stopped by police. 
Appellant’s wife told the police officer who stopped them that Appellant
was having a heart attack.  The officer
directed Appellant’s wife to drive to Trinity Mother Frances Hospital (“Trinity
Mother Frances”).  Appellant was examined
at Trinity Mother Frances.  Following
Appellant’s examination, the medical records that Appellant’s wife gave to the
Trinity Mother Frances staff were returned to Appellant’s wife.  Appellant’s wife then turned over the records
to law enforcement.  Following his
examination at Trinity Mother Frances, Appellant learned that he did not
immediately require heart surgery.

            Appellant was charged by indictment
with robbery.  Specifically, the
indictment alleged that Appellant, while in the course of committing theft of
property and with intent to obtain or maintain control of said property,
intentionally, knowingly, or recklessly caused bodily injury to Rolling, by
striking her with his hand.  Appellant
pleaded “not guilty,” and the matter proceeded to jury trial.

            Rolling testified as the State’s
first witness.  Rolling stated that at
around 2:00 a.m. on January 12, 2004, she received a call from a nurse who told
her that a patient was leaving the hospital with some charts.  Rolling further stated that she encountered
Appellant, and reached unsuccessfully for his bag as Appellant continued walking.  Rolling testified that she told Appellant,
who still had an IV in his arm that he had not yet been released from the
hospital and would need to return so he could have the IV removed and be
discharged against medical advice. 
Rolling further testified that she stood in front of Appellant, grabbed
Appellant, grabbed Appellant’s shirt, and grabbed Appellant’s arm, all in an
attempt to thwart Appellant’s exit, but Appellant continued his egress
unabated.  Rolling stated that when she
reached the exit, Appellant struck her in the face, causing a lens to pop out
of her glasses.  Rolling further stated
that she noticed she was bleeding after Appellant struck her.  Rolling admitted to striking Appellant
multiple times, including hitting Appellant in the chest.  Rolling testified that eventually she and
another security guard, Sam Wagner, realized they would not be able to
physically restrain Appellant so they let him leave, but continued to verbally
instruct Appellant not to leave.  Rolling
further testified that she received two stitches for the injury caused by
Appellant’s blow to her face.

            Former ETMC floor technician Jerry
Jones testified as the State’s next witness. 
Jones testified that on the night in question, he observed Appellant
walking quickly past the cafeteria with a security guard pursuing him.  Jones further testified that the two were
talking back and forth to one another as they approached the exit.  Jones stated that once Appellant was outside,
the security guard reached for his bag and Appellant hit her, breaking her
glasses.  Jones further stated that the
security guard then lunged at Appellant and hit him as the two scuffled.  Jones testified that Appellant and his wife
left following the altercation.  

            Sam Wagner testified next on the
State’s behalf.  Wagner testified that he
was also a security Guard for ETMC and that he grabbed hold of Appellant during
Appellant’s attempt to leave the hospital. 
Wagner’s testimony was largely consistent with Rolling’s account.  Wagner further testified that if, in fact,
Appellant were suffering a heart attack, it would have been in his best
interest to stay in the hospital.  Wagner
stated that patient safety was the “number one duty” and described his efforts
to prevent Appellant’s exit as “encouraging him not to leave.”

            ETMC Release of Information Clerk
Cynthia Woods testified as the State’s next witness.  Woods testified that the medical records
department had care and control of the records at issue while ETMC had custody
of such records.  Woods further testified
that the value of the pages in Appellant’s medical chart, based on the copy fee
per page, was $38.31.  

            Tyler Police Department Officer
Richard Strother testified next on the State’s behalf.  Strother testified that he arrived on the
scene to find a fellow officer, whom he identified as Officer Leigeber, stopped
behind a vehicle with its emergency flashers activated.  Strother stated that he followed Leigeber to
Trinity Mother Frances because one of the passengers in the stopped vehicle was
complaining of chest pains.  Strother further
stated that once inside Trinity Mother Frances, he learned of the disturbance
that had occurred at ETMC Tyler and began to investigate.  Strother testified that he spoke with
Appellant’s wife and a Tyler police sergeant spoke to Appellant.  Strother further testified that he overheard
Appellant say “he had knocked the hell out of two security guards.”  Strother stated that he noted a small scratch
on the top of Appellant’s right hand that had some blood on it.  Strother further stated that he spoke to
Appellant’s wife, and asked her if she had any documents belonging to
ETMC.  Strother testified that Appellant’s
wife then turned over Appellant’s medical records to him.  Strother further testified that he
encountered the two security guards who were earlier involved in the scuffle
with Appellant and stated that they were still wearing their uniforms.  Following Strother’s testimony, the State
rested.  Appellant made a motion for
instructed verdict, which was denied.

            Appellant’s wife, Mary Beason,
testified first on Appellant’s behalf. 
Beason testified that  on January
8, 2004, she and Appellant were at their home when Appellant began complaining
of chest pains and pains in his arm. 
Beason stated that she called 9-1-1 and that Appellant was taken to ETMC
Carthage by ambulance.  Beason further
stated that following treatment at ETMC Carthage, Appellant was transferred to
ETMC Tyler for a heart catheterization, a procedure they were told would be
performed by a specialist.  Beason
testified that though she met the physician who performed the heart
catheterization, a surgeon never came by to meet with them, despite multiple
requests.  Beason further testified that
she and her husband ultimately lost faith in the process at ETMC and decided to
leave.  Beason stated that she and her
husband requested copies of his medical records several times before
leaving.  Beason further stated that they
were given a copy of Appellant’s medical records to review, which she
ultimately took with them.  Beason also
stated that as she and Appellant searched for the exit, a female security guard
addressed Appellant, exclaiming, “Are the papers in the bag?”  According to Beason, when Appellant responded
“No,” the security guard grabbed his arm, which still had an IV in it, and took
the bag from him.  Beason continued,
stating that the security guard passed them and blocked their exit.  Beason testified that as Appellant attempted
to exit, the security guard again grabbed Appellant’s arm in spite of Beason’s
pleas, “Don’t touch him.  He’s a heart
patient.”  Beason further testified that,
once outside, Appellant continued in his attempt to break free from the
security guard and fell into the flower bed. 


            Beason stated that she and her
husband made their way to their car and left ETMC Tyler for the University of
Texas Health Center.  Beason further
stated that en route, they were stopped by a police officer.  Beason testified that she told the officer
her husband was having a heart attack and that the officer told her she had
just passed Trinity Mother Frances. 
Beason further testified that she and Appellant drove to Trinity Mother
Frances.  Beason stated that she gave the
medical records to Trinity Mother Frances personnel and later, after getting
the records back, she gave them to a police officer.  Beason further stated that during his
conversation with a police officer, Appellant stated, “How would I take time
out of having a heart attack to beat the hell out of two security guards.”  Beason testified that Appellant ultimately
had open heart surgery in Arkansas.  On
cross examination, Beason further testified that she did not know whether
Appellant struck the female security guard as they left ETMC Tyler that night.  Beason denied being told that she could not
leave the hospital with Appellant’s original medical records or that the
records were the hospital’s property. 
Rather, Beason stated that she was told by the nursing supervisor on the
phone that “she would not take the medical records away from a heart patient.”  Beason further stated that she was not aware
of federal law as it pertained to Appellant’s medical records.

            Appellant testified next on his own
behalf.  Appellant recounted the same
events as had his wife, relating to his decision to leave ETMC Tyler on the
night in question.  Appellant stated that
he was told he needed to have bypass surgery immediately.  Appellant testified that he requested copies
of his medical records several times, but was not given the copies he
requested.  Appellant testified that he
believed the records were his.  Appellant
further testified regarding his struggle with the two security guards.  Appellant stated that he was suffering chest
pains during the struggle.  Specifically,
Appellant stated that he “felt like an elephant [was] sitting on [his] chest,”
and that this pain continued even following their arrival at Trinity Mother
Frances.  Appellant confirmed the
accuracy of his wife’s testimony that he stated to a police officer, “How would
I take time out of having a heart attack to beat the hell out of two security
guards.”  Appellant stated that he still
believed the records to be his and that he thought it was necessary to take
them for his personal health and welfare. 
On cross examination, Appellant denied telling a doctor at Trinity Mother
Frances that he punched a security guard who had grabbed his arm.  Appellant later testified that he did not
have any knowledge of intentionally striking Rolling, and further denied
striking Rolling or Wagner.  Appellant
stated that no one told him he could not take his medical records from ETMC
Tyler.  Appellant further stated that he
had bypass surgery at a Veterans Administration hospital in Little Rock,
Arkansas approximately three weeks following the incident.

            Kevin Jones, criminal investigator
for the Panola County District Attorney, testified as Appellant’s next
witness.  Jones testified that Appellant
had a good reputation in his community for being a peaceable and law abiding
citizen.  Jones further testified that
Appellant had a good reputation in his community for being a truthful
person.  Jones also stated that Beason
had a good reputation in her community for being a truthful person. 

            Barry Washington testified next on
Appellant’s behalf.  Washington testified
that he spent twenty-three years in Panola County, Texas as a state trooper and
was currently employed by Panola County at the adult district probation
office.  Washington testified that he had
known Appellant for twenty-four years and that Appellant had a reputation in
his community for being a peaceable, law abiding, and truthful person.  Washington also stated that Beason had a
reputation in the community for being a truthful person.  Following Washington’s testimony, Appellant
rested.  

            In rebuttal, the State called ETMC
Tyler registered nurse Amber Moore. 
Moore testified that she was currently working in the cardiovascular
intensive care unit.  Moore further
testified that at the time in question, she was working in the intermediate
cardiac unit at ETMC Tyler.  Moore
identified Appellant as a patient who was in her unit on the night in
question.  Moore recalled speaking to
Appellant concerning his review of his medical records.  Moore testified that when Appellant requested
to take his medical records, she called Dianne Ohmes, the house supervisor,
because she was not familiar with hospital policy in this regard.  Moore further testified that after speaking
to Ohmes, she informed Appellant that he would need to have someone in the
medical records department make copies of the medical records.  Moore stated that she informed him of this
fact at least five times and further stated that she informed Appellant that
the medical records department would not be able to make copies until it opened
in the morning.  Moore testified that
Appellant took the records to his room while discussing a matter with the
nursing supervisor.  Moore further
testified that Appellant spoke to the vice president of the hospital.  Moore stated that Appellant and his wife
subsequently left the room and that Appellant left an empty binder in which the
medical records are ordinarily kept at the nurses’ station.  On cross examination, Moore discussed the
notes she had made on Appellant’s chart.

            ETMC Tyler Administrative Chief
Executive Officer Robert Evans testified as the State’s next rebuttal
witness.  Evans testified that he
recalled speaking to a patient on the phone in the early morning hours of
January 12, 2004, but did not remember the patient’s name.  Evans further testified that the original
medical records are the property of the hospital.  Evans stated that in his twenty-five years of
experience, he had never allowed a person to take any original records from the
hospital.  Evans was permitted to read
the following passage from the ETMC Tyler Administrative Manual:

 

...The patient’s right of access in no way abrogates the
hospital’s property rights in its record and its right to establish reasonable
procedures for access to the patient’s record. 


 

East Texas Medical Center recognizes the patient or
his authorized representative’s right of access to his medical record for
review and to request correction or amendment to the record, providing the
following requirements are met.  However,
if a physician determines that access to the information could be harmful to
the physical, mental, or emotional health of the patient, the physician may
recommend that the medical record information not be disclosed to the patient
....

 

Procedure, number one, the patient must complete an authorization
and request form.  Number two, the
attending physicians may be notified that the patient has requested access to
his medical record.  Number three, a
designated hospital employee will be present at all times during the
review.  Number four, prepayment of
reasonable approved fees for copies, if requested, will be assessed.  Number five, a reasonable period of time is
required between request and review.  The
review will take place during regular working hours, Monday through Friday,
8:00 a.m. through 4:30 p.m. 

 

Evans testified
that, to the best of his knowledge, what he read was the policy in effect on
the date in question.  On cross
examination, Evans stated that in an emergency situation, if a hospital or
another clinical practitioner wanted a copy of a record, the record would be
sent to them immediately.

            Ohmes testified as the State’s next
rebuttal witness.  Ohmes testified that,
on the night in question, she was employed by ETMC Tyler as “House Supervisor.”  Ohmes further testified that she told
Appellant he could not take any medical records, but that copies would be made
available to him between 8:00 a.m. and 4:00 p.m. the next day.  Ohmes stated that if another hospital or
emergency room contacted them wanting medical records on a patient at 3:00
a.m., she would have gotten the records to them.  Ohmes further stated that she, at no time,
gave Appellant permission to leave the hospital with the medical records.  At the conclusion of Ohmes’s testimony, both
the State and Appellant rested and closed.

            Ultimately, the jury found Appellant
guilty as charged.  Following a trial on
punishment, the jury assessed Appellant’s punishment at confinement for two
years, but recommended that Appellant’s sentence be probated for two
years.  The trial court sentenced
Appellant accordingly, and this appeal followed.

Evidentiary Sufficiency

            In his first issue, Appellant
contends that the evidence was legally insufficient to support his
conviction.  In his fifth issue,
Appellant contends that the evidence was factually insufficient to support his
conviction.

Legal
Sufficiency








            Legal sufficiency is the
constitutional minimum required by the Due Process Clause of the Fourteenth
Amendment to sustain a criminal conviction. 
See Jackson v. Virginia, 443 U.S. 307, 315–16, 99 S. Ct.
2781, 2786–87, 61 L. Ed. 2d 560 (1979); see also Escobedo v. State,
6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref’d).  The standard for reviewing a legal
sufficiency challenge is whether any rational trier of fact could have found
the essential elements of the offense beyond a reasonable doubt.  See Jackson, 443 U.S. at 320,
99 S. Ct. at 2789; see also Johnson v. State, 871 S.W.2d 183, 186
(Tex. Crim. App. 1993).  The evidence is
examined in the light most favorable to the jury’s verdict.  See Jackson, 443 U.S. at 320,
99 S. Ct. at 2789; Johnson, 871 S.W.2d at 186.  A successful legal sufficiency challenge will
result in rendition of an acquittal by the reviewing court.  See Tibbs v. Florida, 457 U.S.
31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982).

            The sufficiency of the evidence is
measured against the offense as defined by a hypothetically correct jury
charge.  See Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997). 
Such a charge would include one that “accurately sets out the law, is
authorized by the indictment, does not unnecessarily increase the State’s
burden of proof or unnecessarily restrict the State’s theories of liability,
and adequately describes the particular offense for which the defendant is
tried.”  Id.  

            To support a conviction for robbery,
the evidence must support that the accused, in the course of committing theft
and with intent to obtain or maintain control of the property, intentionally,
knowingly, or recklessly caused bodily injury to another or intentionally or
knowingly threatened or placed another in fear of imminent bodily injury or
death.  See Tex. Penal Code Ann. § 29.02(a) (Vernon
2003).  Theft consists of the unlawful
appropriation of property, i.e., without the owner’s effective consent, with
the intent to deprive the owner of the property.  See Tex.
Penal Code Ann. § 31.03(a) (Vernon Supp. 2007).

Ownership








            An “owner” of property includes a
person who has possession of the property, whether lawful or not or a greater
right to possession of the property than the actor.  See Tex.
Penal Code Ann. §1.07(a)(35)(A) (Vernon Supp. 2007).  Appellant first argues that he had a superior
right to possession of the records he took and, therefore, was the owner of
those records.  Appellant’s contention is
based on his interpretation of portions of the Health Insurance Portability and
Accessibility Act of 1996 (“HIPAA”). 
Specifically, Appellant notes that (1) an entity covered by HIPPA is
required to disclose health information to an individual when requested,[2]
(2) an individual has a right of access to inspect and obtain a copy of
protected health information about the individual in a designated record set,[3]
and (3) the covered entity must, among other things, provide the access
requested.[4]  However, each of the code sections to which
Appellant cites presupposes that the covered entity has a right to possess such
health records.  While the code sections
speak to an individual’s rights of disclosure and access, they do not make
reference or otherwise create any superior right of possession such as is
claimed by Appellant.

            In the instant case, Woods testified
that ETMC had custody, care, and control of Appellant’s original medical
records.  Furthermore, Evans testified
that the original medical records are the property of the hospital.  Ohmes testified that she told Appellant he
could not take any medical records, but that copies would be made available to
him between 8:00 a.m. and 4:00 p.m. the next day.  Ohmes also stated that she, at no time, gave
Appellant permission to leave the hospital with the medical records.  From the foregoing, we conclude that there
was legally sufficient evidence that the hospital was the legal owner of the
records.  See Tex. Penal Code Ann. §1.07(a)(35)(A). 

Value

            Appellant next argues that the sole
evidence regarding the value of the records was Woods’s testimony that the
value of the pages in Appellant’s medical chart, based on the copy fee per
page, was $38.31 and that there was no evidence of the actual value of the
sheets of paper, which could not be separated from the information on them.

            The value of property taken is
either (1) the fair market value of the property at the time and place of the
offense or (2) the cost of replacing the property within a reasonable time
after the offense if its fair market value cannot be ascertained.  See Tex.
Penal Code Ann. § 31.08(a) (Vernon 2003).  “Market value” as it relates to stolen
property means the amount of money that the property would sell for in cash,
giving a reasonable time for selling it. 
See Johnson v. State, 903 S.W.2d 496, 498 (Tex. App.–Fort
Worth 1995, no pet.).  The owner of
property is competent to testify about the value of his own property in general
and commonly understood terms.  Id.  When an owner testifies, the presumption must
be that the owner is testifying to an estimation of the fair market value.  Id. (citing Sullivan v.
State, 701 S.W.2d 905, 909 (Tex. Crim. App. 1986)).  Testimony of this nature is an offer of the
witness’s best knowledge of the value of his property and constitutes
sufficient evidence for the trier of fact to make a determination about value
based on the witness’s credibility.  Id.
 This is true even absent a
specific statement about “market value.” 
Id.  If the
defendant wishes to rebut the owner’s opinion, he must offer controverting
evidence about the value of the property.

            In the case at hand, Woods testified
that she worked at ETMC Tyler as a release of information clerk.  Woods testified that the medical records
department in which she worked had care and control of the records at issue
while ETMC had custody of such records. 
Woods further testified that the value of the pages in Appellant’s
medical chart, based on the copy fee per page, was $38.31.  We conclude that the aforementioned evidence
adequately supports that the records at issue had a fair market value of $38.31
because they could be sold as copies for that amount.  Therefore, we hold that there was legally
sufficient evidence as to the records’ fair market value.  

            Use of Force[5]

            Appellant next argues that there was
no evidence that the documents were obtained by force.  Rather, Appellant argues that the evidence of
force occurred after Appellant had taken the documents.  However, the State was not required to prove
that Appellant obtained the documents by use of force.  Rather, to prove the offense of robbery, the
State need only prove that the person’s actions were committed in the course of
committing a theft.  See Tex. Penal Code Ann. § 29.02(a).  The term “in the course of committing a theft”
means conduct that occurs in an attempt to commit, during the commission, or in
the immediate flight after an attempt or commission of a theft.  See
Tex. Penal Code Ann. §
29.01(1) (Vernon 2003).  

            In the case at hand, Rolling
testified that when she reached the exit, Appellant struck her in the face,
causing a lens to pop out of her glasses. 
Jones also testified that when Appellant was outside, the security guard
reached for his bag and Appellant hit her, breaking her glasses.  Thus, we hold that there was legally
sufficient evidence that Appellant, in the course of committing a theft, caused
bodily injury[6] to another. 
Appellant’s first issue is overruled.

Factual
Sufficiency

            Turning to Appellant’s contention
that the evidence is not factually sufficient to support his conviction, we
must first assume that the evidence is legally sufficient under the Jackson
standard.  See Clewis v. State,
922 S.W.2d 126, 134 (Tex. Crim. App. 1996). 
We then consider all of the evidence weighed by the jury that tends to
prove the existence of the elemental fact in dispute and compare it to the
evidence that tends to disprove that fact. 
See Santellan v. State, 939 S.W.2d 155, 164 (Tex.
Crim. App. 1997).  Although we are
authorized to disagree with the jury’s determination, even if probative
evidence exists that supports the verdict, see Clewis, 922 S.W.2d
at 133, our evaluation should not substantially intrude upon the jury’s role as
the sole judge of the weight and credibility of witness testimony.  Santellan, 939 S.W.2d at
164.  Where there is conflicting
evidence, the jury’s verdict on such matters is generally regarded as
conclusive.  See Van Zandt v. State,
932 S.W.2d 88, 96 (Tex. App.–El Paso 1996, pet. ref’d).  Ultimately, we must ask whether a neutral
review of all the evidence, both for and against the finding, demonstrates that
the proof of guilt is so obviously weak as to undermine our confidence in the
jury's determination, or the proof of guilt, although adequate if taken alone,
is greatly outweighed by contrary proof. 
Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); see
also Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App.
2006) (evidence is factually insufficient only when reviewing court objectively
concludes that the great weight and preponderance of the evidence contradicts
the jury’s verdict).

            Appellant limits his factual
sufficiency contention to the proof of value of the records at issue.  We have reviewed the record in its
entirety.  We iterate that our evaluation
should not substantially intrude upon the jury’s role as the sole judge of the weight
and credibility of witness testimony, see Santellan, 939
S.W.2d at 164, and where there is conflicting evidence, the jury’s verdict on
such matters is generally regarded as conclusive.  See Van Zandt, 932 S.W.2d at
96.  Woods’s testimony was the sole
testimony related to the records’ value. 
Appellant elected not to cross examine Woods.  Our review of the record as a whole, with
consideration given to all of the evidence, both for and against the jury’s
finding, has not revealed to us any evidence that causes us to conclude that
the proof of guilt is so obviously weak or is otherwise so greatly outweighed
by contrary proof as to render Appellant’s conviction clearly wrong or
manifestly unjust.  Therefore, we hold
that the evidence is factually sufficient to support the jury’s verdict.  Appellant’s fifth issue is overruled.

Charge Instruction
on Necessity

            In his second issue, Appellant
argues that the trial court erred in refusing to instruct the jury in its
charge regarding the justification of necessity.  Upon a timely request, a defendant has the
right to an instruction on any defensive issue raised by the evidence, whether
such evidence is strong or weak, unimpeached or contradicted, regardless of
what the trial court may or may not think about the credibility of this
evidence.  McGarity v. State,
5 S.W.3d 223, 226 (Tex. App.–San Antonio 1999, no pet.) (citing Miller v.
State, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991)).  A charge on a defensive issue is required if
the accused presents affirmative evidence that would constitute a defense to
the crime charged and a jury charge is properly requested.  See id.  If the issue is raised by any party, refusal
to submit the requested instruction is an abuse of discretion.  McGarity, 5 S.W.3d at 226.  When the evidence fails to raise a defensive
issue, the trial court commits no error in refusing a requested
instruction.  See id. at
227.  

            For the evidence to support
submission of the necessity defense to the jury, the defendant must admit to
the offense.  Id.; see
Allen v. State, 971 S.W.2d 715, 720 (Tex. App.–Houston [14th Dist.]
1998, no pet.).  The necessity
instruction is not required unless there was evidence from the accused
admitting the offense, and henceforth claiming justification for having committed
the offense because of other facts.  See
Maldano v. State, 902 S.W.2d 708, 712 (Tex. App.–El Paso 1995, no
pet.).  One cannot establish that an act
is justified without first identifying or admitting to the commission of the
act.  Id.  

            In the case at hand, Appellant did
not admit to committing robbery.  Rather,
Appellant sought to challenge the hospital’s ownership of the records he took
and declined to admit that he struck Rolling. 
Therefore, we hold that the trial court did not err in refusing to instruct
the jury on the defense of necessity in its charge.  Appellant’s second issue is overruled.

 

Charge Instruction
on Duress

            In his third issue, Appellant argues
that the trial court erred in refusing to instruct the jury in its charge on
the defense of duress.  “When raised by
the evidence and timely requested, a defendant is entitled to a jury
instruction on the affirmative defense of duress if he engaged in the
proscribed conduct because he was compelled to do so by threat of imminent
death or serious bodily injury to himself or another.”  Shaw v. State, 874 S.W.2d 115,
119 (Tex. App.–Austin 1994, no pet.) (emphasis added).  Thus, similar to the justification of
necessity, the affirmative defense of duress requires that the accused admit to
having engaged in the proscribed conduct. 
See, e.g., Bernal v. State, 647 S.W.2d 699, 706 (Tex. App.–Dallas
1983, no pet.) (appellant’s denial of having had sexual intercourse with
complainant did not raise issue of his having “engaged in the proscribed
conduct”).  As set forth above, Appellant
did not admit to committing robbery in the instant case.  Therefore, we hold that the trial court did
not err in refusing to instruct the jury on the defense of duress in its
charge.  Appellant’s third issue is
overruled.

 

Charge Instruction
Regarding Definition of “Owner”

            In his fourth issue, Appellant
argues that the trial court erred in failing to properly instruct the jury
regarding the definition of “owner” for purposes of the theft and robbery
statutes.  Specifically, Appellant argues
that the jury should have been instructed that an owner includes a person who
has a greater right to possession of the property than the actor at the time
of the alleged commission of the offense. 
When reviewing charge error, we employ a two step analysis. Washington
v. State, 930 S.W.2d 695, 698 (Tex. App.–El Paso 1996, no pet.).  We must first determine whether error
actually exists in the charge.  See Almanza
v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984); Washington,
930 S.W.2d at 698.  In making this
determination, we view the charge as a whole and our review should not be
limited to a series of isolated statements or parts of the charge standing
alone.  Washington, 930
S.W.2d at 698; see Holley v. State, 766 S.W.2d 254, 256
(Tex. Crim. App. 1989).  Second, we must
determine whether sufficient harm resulted from the error to require
reversal.  Almanza, 686
S.W.2d at 171; Washington, 930 S.W.2d at 698.  Which harmless error standard applies depends
upon whether the defendant objected.  Abdnor
v. State, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); Washington,
930 S.W.2d at 698.  In a case where the
defendant failed to object, he must show that he suffered actual egregious
harm.  See Almanza, 686
S.W.2d at 171; Washington, 930 S.W.2d at 698.

            In the case at hand, Appellant
argues that the temporal addition to the definition of “owner” was necessary to
allow the jury to consider whether Appellant had gained a superior right to
possession by the time he and his wife left the hospital inasmuch as they had
requested copies and been told that copies would not be available until
morning.  However, the trial court
defined the word “owner” in accordance with Texas Penal Code, section
1.07(a)(35)(A).  Moreover, in the
application  paragraph, the jury was
charged that it could find Appellant guilty of robbery if it found that on or
about January 12, 2004, in Smith County, Texas, Appellant did then and there
unlawfully appropriate, by acquiring or exercising control over property from
the person of the owner with intent to deprive the owner of the property.  The term “then and there,” as used in the
application paragraph, means at the time and place last previously mentioned or
charged.  See Black’s Law Dictionary 1478 (6th ed.
1990).  Thus, the jury was given a
temporal framework within which to consider the evidence and make its
finding.  Further still, as set forth
above, the rights of disclosure and access in HIPPA do not serve to create a
superior right of possession in Appellant to the medical records either before
or after he  requested copies of the
documents.  Having reviewed the charge as
a whole in light of the entirety of the record, we hold that the trial court
did not err in declining to submit Appellant’s temporal element to its
definition of the word “owner.” 
Appellant’s fourth issue is overruled.

Disposition

            Having
overruled Appellant’s first, second, third, fourth, and fifth issues, we affirm
the trial court’s judgment.

                                                                                                     JAMES T. WORTHEN    

                                                                                                                 Chief Justice

Opinion
delivered January 9, 2008.

Panel consisted of Worthen, C.J.,
Griffith, J., and Hoyle, J.

 

 

(DO NOT PUBLISH)











[1] Ownership of these medical records is a contested issue in this
case.  Our reference to these records as “Appellant’s
medical records” is made solely for ease of reference and should be interpreted
as “medical records pertaining to Appellant.”





[2] See 45
C.F.R. § 164.502(a)(1), (2) (2007).





[3] See 45
C.F.R. § 164.524 (2007).





[4] See 45
C.F.R. § 164.524(c) (2007). 





[5] Appellant raises this issue under his factual sufficiency
argument.  We presume that Appellant
intended to raise this “no evidence” issue as a legal sufficiency contention.





[6] Appellant has not
argued that the evidence is insufficient to support the element of bodily
injury.  Bodily injury is defined as
physical pain, illness, or any impairment of physical condition.  Tex.
Penal Code Ann. § 1.07(a)(8) (Vernon 2007).  The definition is broad and encompasses even
relatively minor physical contacts as long as they constitute more than mere
offensive touching.  Lane v. State,
763 S.W.2d 785, 786 (Tex. Crim. App. 1989); In re M.C.L., 110
S.W.3d 591, 600 (Tex. App.–Austin 2003, no pet.).  The evidence in the instant case supports
contact amounting to more than offensive touching inasmuch as it was enough to
cause the lens to pop out of Rolling’s glasses and break the skin ultimately
requiring two stitches.