# IN THE COURT OF APPEALS OF IOWA

No. 20-0628
Filed October 20, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DOUGLAS EVANDER ST. CYR,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Woodbury County, Steven J. Andreasen, Judge.

Douglas Evander St. Cyr appeals his convictions for multiple crimes following a bench trial. **AFFIRMED.**

Matthew R. Metzgar of Widdison Law Firm, (until withdraw), Sioux City, and Priscilla Forsyth, Sioux City, for appellant.

Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and Tabor and Ahlers, JJ.

**AHLERS, Judge.**

Douglas Evander St. Cyr appeals his convictions in two cases. The two cases were tried together in a bench trial.

The first case stemmed from a traffic stop. Based on items found in the vehicle and his driving status, St. Cyr was convicted of (1) possession of methamphetamine, third or subsequent offense, as a habitual offender, in violation of Iowa Code sections 124.401(5) and 902.8 (2018); and (2) driving while barred in violation of section 321.561. St. Cyr appeals from those convictions based on his claim that his vehicle was unlawfully stopped and all evidence found following the stop should be suppressed.

The second case stems from the first. When St. Cyr failed to appear for his trial in the first case, a warrant for his arrest was issued. When officers tried to stop a vehicle St. Cyr was driving to execute the warrant, St. Cyr rammed a vehicle driven by one of the officers, fled the scene in his vehicle, and later abandoned the vehicle with contraband in it. Based on these events, St. Cyr was convicted of (1) failure to appear in a case involving a felony as a habitual offender in violation of sections 811.2(8) and 902.8 (2019); (2) assault with a dangerous weapon in violation of section 708.2(3)[1]; (3) leaving the scene of a personal injury accident in violation of sections 321.261(2) and 321.263; (4) possession of ammunition by a domestic abuser as a habitual offender in violation of sections 724.26(2) and 902.8; and (5) driving under a suspended license in violation of section 321.218(1).

---

[1] This was a lesser-included offense to the original charge of assault of a peace officer with a dangerous weapon. The district court found St. Cyr not guilty of the greater charge due to lack of proof St. Cyr knew the plainclothes officer driving an unmarked vehicle was a peace officer.

St. Cyr raises four issues on appeal: (1) the district court erred in denying his motion to suppress evidence in the first case; (2) there was insufficient evidence supporting his conviction for failure to appear; (3) there was insufficient evidence supporting his conviction for assault with a dangerous weapon; and (4) the State failed to prove that he did not act out of necessity or compulsion when he drove into the officer's vehicle and fled the scene.

## I.     Lawfulness of the Stop in the First Case – Suppression Issue

We begin by addressing St. Cyr's challenge to the district court's suppression ruling in the first case.

### A.     Standard of Review and Legal Standards

We review a court's denial of a motion to suppress based on the deprivation of a constitutional right de novo.  *State v. Brown*, 890 N.W.2d 315, 321 (Iowa 2017). In a de novo review, we conduct an evaluation of the totality of the circumstances presented in the record.  *Id.*  Though not bound by them, we give deference to the district court's findings of fact because the court had the opportunity to assess the credibility of witnesses.  *Id.*

The Iowa Constitution protects people from unreasonable searches and seizures and reads:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8.  Because it closely parallels the language of the federal constitution, the Iowa Constitution's search-and-seizure clause is generally

interpreted in line with federal Fourth Amendment cases. *State v. Warren*, 955 N.W.2d 848, 859 (Iowa 2021).

A temporary detention as a result of a traffic stop is a seizure within the meaning of the Fourth Amendment. *State v. Lloyd*, 701 N.W.2d 678, 680 (Iowa 2005). The search-and-seizure provisions of both constitutions generally require a warrant before a seizure of a person is permitted, with certain exceptions. *State v. Struve*, 956 N.W.2d 90, 95 (Iowa 2021). One exception permits an officer to briefly detain a motorist to investigate whether a traffic violation has been or is being committed, so long as the officer has reasonable suspicion that the violation has occurred. *Id.* Suspicion, curiosity, or a hunch that a traffic infraction has occurred is not enough. *Id.* at 96. If the State fails to meet its burden to prove reasonable suspicion justifying an investigatory stop, the remedy is to suppress all evidence obtained from the stop. *State v. Vance*, 790 N.W.2d 775, 781 (Iowa 2010).

**B.      Discussion of the Merits**

The officer stopped St. Cyr for driving a vehicle with no registration plates. Iowa law requires motor vehicles to have front and rear registration plates. *See* Iowa Code § 321.37(1) (requiring registration plates to be attached to a motor vehicle, with "one in the front and the other in the rear"). St. Cyr asserts his operation of the vehicle was lawful because the vehicle had a valid Nebraska, dealer-issued, in-transit paper registration taped to the back window. *See id.* § 321.25(1) (permitting a vehicle to be operated on Iowa highways without registration plates for a period of forty-five days after the date of delivery of the vehicle to the purchaser from a dealer if a card bearing the words "registration

applied for" is attached to the rear of the vehicle). The State does not challenge St. Cyr's assertion, so we conclude St. Cyr properly attached proof of registration to the vehicle. However, that does not end the discussion because resolution of the suppression issue turns on the circumstances surrounding the officer's mistake.

An officer's mistake of fact will not always negate the validity of a traffic stop. *State v. Lloyd*, 701 N.W.2d 678, 681 (Iowa 2005). An officer is justified in making a stop if the officer had an objectively reasonable basis for believing a traffic violation had occurred, even if it turns out the officer is mistaken. *Id.* If an officer's beliefs are objectively reasonable, and if a stop would have been proper if the facts had been as the officer initially perceived them to be, the stop remains valid. *Id.*

On our de novo review, bolstered by the district court's favorable findings on the officer's credibility, we find the officer's mistake was objectively reasonable. When the officer stopped St. Cyr, it was in the very early morning hours and it was dark outside. St. Cyr brought his vehicle to a stop in an alley, but not far enough into the alley to allow the officer to park the officer's vehicle directly behind St. Cyr. As a result, the officer parked the patrol vehicle at an angle behind St. Cyr such that the officer did not initially have a view of the passenger side of the back window where the temporary registration card was taped as the officer approached. Given that the officer was alone approaching an unknown driver in the dark at a time of day when others are not present, the officer focused on the driver as the officer approached the vehicle. The officer did not notice the temporary registration card. Shortly after reaching St. Cyr, the officer discovered independent reasons for seizing St. Cyr, namely that he possessed methamphetamine and his license was

suspended. Only after making these discoveries did the officer become aware of the temporary registration card hanging in the rear window on the passenger side. Based on these circumstances, we find the officer's mistake was objectively reasonable, and the mistake did not negate the legality of the stop.[2]

The dissent relies heavily on *State v. Coleman,* 890 N.W.2d 284 (Iowa 2017), and cases in the same line that address prolonging a stop after a mistake has been discovered. We respectfully disagree that *Coleman* applies here. The legal principle established by *Coleman* is that "when the reason for a traffic stop is resolved and there is no other basis for reasonable suspicion, article I, section 8 of the Iowa Constitution requires that the driver must be allowed to go his or her way without further ado."[3] 890 N.W.2d at 301. *Coleman* did not change the legal

---

[2] Our finding follows other cases with similar fact patterns. *See, e.g., United States v. Flores-Sandoval*, 366 F.3d 961, 962–63 (8th Cir. 2004) (upholding the validity of a vehicle stop for failing to display a front license plate even though it was later determined the vehicle did in fact have a properly displayed front plate); *Lloyd*, 701 N.W.2d at 679–82 (upholding the constitutionality of the stop when the vehicle did not have permanent license plates but had a valid temporary plate taped to the car's rear window); *State v. Jackson*, 315 N.W.2d 766, 767 (Iowa 1982) (upholding the validity of a vehicle stop for failure to display license plates even though the officer later learned the vehicle was displaying proper temporary plates), *overruled on other grounds by State v. Coleman*, 890 N.W.2d 284, 301 (Iowa 2017).

[3] In reaching this conclusion, the supreme court overruled *State v. Jackson*, 315 N.W.2d 766 (Iowa 1982), but only to the extent it "is inconsistent with our holding today." *Coleman*, 890 N.W.2d at 301. The dissent questions whether *Coleman* overruled *Jackson* on broader grounds than we suggest in the previous footnote. The dissent points to "the interface between the grounds for the initial stop and the grounds for a continued detention." Our disparate conclusions on the scope of *Coleman*'s overruling of *Jackson* highlight the differences in how we view the issue in this case. In our view, *Coleman* overrules *Jackson* to the extent *Jackson* permitted continued detention and investigation after the grounds for the stop had been discovered to be based on a mistake. We see nothing in *Coleman* suggesting it overrules *Jackson*'s holding that permitted a stop for a reason that turned out to be a mistake (i.e., a stop based on failure to display registration plates when it turned out the vehicle had a temporary paper registration displayed). *Jackson*, 315 N.W.2d at 767.

principles governing a stop *before* the mistake is discovered; it only changed the principles about what is permissible *after* the mistake is discovered. Here, as already discussed, the officer did not see the paper registration card hanging in the back window when the officer first approached the vehicle because it was dark, the temporary registration card was in the back window on the opposite side, and the officer's attention was preliminarily focused on the driver. Upon contacting the driver, the officer's interaction was consistent with the reason for the stop, as he informed St. Cyr he stopped him because the car lacked registration plates. St. Cyr responded, not by pointing out the temporary registration card hanging in the back window, but by stating the car was not his and it belonged to his brother's girlfriend. When the officer then asked for St. Cyr's driver's license, the illegal drugs came into view beside St. Cyr's leg and were seized by the officer. Upon discovery of the illegal drugs, there were independent grounds for prolonging the stop. *See State v. Warren*, 955 N.W.2d 848, 866 (Iowa 2021) (permitting extended seizure following a stop based on a traffic violation when officers develop reasonable suspicion of another crime).

We do not dispute the dissent's contention that *Coleman* would require St. Cyr's release if the temporary registration had been discovered before the contraband. But, it wasn't—the contraband was discovered first. While the officer did not look for a temporary registration card hanging in the back window before approaching the driver, his actions did not unconstitutionally prolong the stop. We see nothing in our case law that requires an officer to investigate in any particular way, so long as the method used is reasonable. *See State v. Salcedo*, 935 N.W.2d 572, 577 (Iowa 2019) (acknowledging the propriety of "inquiries reasonably related

to the mission of addressing the traffic infraction" after a lawful stop). Certainly, with the benefit of hindsight, the officer could have gone to the back or the other side of the vehicle to look for a temporary registration hanging in the window before approaching the driver and, if he had, he may have seen the temporary registration card. However, that is not the only reasonable method of investigating. The officer could have also conducted the investigation by doing what he did, which was to talk to the driver about the problem. Had St. Cyr pointed out the temporary registration card at that time, the basis for the stop would have ended and *Coleman* would kick in. But, that's not what happened. Instead, St. Cyr provided no information to dispel the officer's suspicion that St. Cyr was driving the vehicle without registration plates displayed, so the basis for the stop continued. Almost immediately thereafter, the illegal drugs came into view.

The discovery of the contraband before the discovery of the mistaken basis for the stop causes this case to be governed by cases involving similar fact patterns, examples of which are cited in footnote 2, and not by the cases relied upon by the dissent that address prolonging the stop after discovery of a mistaken basis for the stop or resolution of the basis for the stop. We conclude the district court properly denied the motion to suppress despite the officer's mistake.

## II.     Sufficiency of the Evidence Claims

St. Cyr's final three claims on appeal all relate to the sufficiency of evidence supporting two of his convictions and negating his claimed defenses.

**A.	Standard of Review**

Sufficiency of the evidence claims in criminal cases are reviewed for errors at law. *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014).

> [C]ourts consider all of the record evidence viewed in the light most favorable to the State . . . . [W]e will uphold a verdict if substantial record evidence supports it. . . . Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.

*Id.* (second alteration in original) (quoting *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012)). When evaluating sufficiency-of-the-evidence challenges, we do not resolve conflicts in the evidence, pass upon the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence, as such matters are for the factfinder to determine. *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006). In a bench trial, we review the district court's findings as we would a jury verdict, meaning we will affirm the verdict if supported by substantial evidence. *State v. Weaver*, 608 N.W.2d 797, 803 (Iowa 2000).

**B.	Discussion of the Merits**

We will discuss each sufficiency-of-the-evidence challenge separately.

**1.	Failure to Appear**

St. Cyr was charged with failure to appear after he failed to attend his scheduled trial in the first case. Iowa Code section 811.2(8) reads, in pertinent part: "Any person who, having been released pursuant to this section, willfully fails to appear before any court or magistrate as required shall, . . . if the person was released in connection with a charge which constitutes a felony, . . . be guilty of a

class 'D' felony." Willfully is defined as the "voluntary or intentional violation of a known legal duty." *State v. Johnson*, 770 N.W.2d 814, 824 (Iowa 2009).

St. Cyr contends the State failed to prove beyond a reasonable doubt that he willfully failed to appear in court. The district court found the evidence established St. Cyr's guilt beyond a reasonable doubt. Our role on appeal is to view the evidence in the light most favorable to the State; it is not to resolve conflicts in the evidence, pass upon the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. *See Musser*, 721 N.W.2d at 761. Viewed in the light most favorable to the State, St. Cyr had notice of his trial date. St. Cyr's parole officer testified she mailed St. Cyr a packet of information, including notice of the court date. Even though the evidence shows that two slightly different addresses for St. Cyr had been provided for entry in court and parole office records, it was the district court's role as fact finder to determine whether the address used was the correct address for St. Cyr. There is substantial evidence supporting the district court's finding that the notice of the court date was mailed to the correct address, as the parole officer mailed the notice of the court date to one of the addresses listed as St. Cyr's address and the mail was never returned as undeliverable.

Furthermore, St. Cyr's attorney of record was also notified of the trial date that St. Cyr missed. Generally, notice to counsel is notice to the client. *Robinson v. State*, 687 N.W.2d 591, 591 (Iowa 2004). We are not declaring that evidence that St. Cyr's counsel of record was notified of the trial date establishes as a matter of law that St. Cyr received notice. However, it contributes to the evidence that St. Cyr received the notice and supports the district court's finding to that effect.

Finally, as the district court noted in its detailed findings, the fact that law enforcement was unable to locate St. Cyr and execute the warrant for over four months, coupled with the fact St. Cyr then tried to avoid apprehension on the warrant by ramming a vehicle and fleeing the scene, is circumstantial evidence that St. Cyr knew of the trial and willfully failed to appear.

While the evidence may have supported a contrary finding, the ultimate question is not whether the evidence supports a different finding, but whether it supports the finding actually made. *See State v. Dohlman*, 725 N.W.2d 428, 430 (Iowa 2006). Viewed in the light most favorable to the State, there was substantial evidence supporting the district court's finding of guilt on the failure-to-appear charge.

### 2. Assault with a Dangerous Weapon

In a helpful inclusion in its ruling, the district court recited the elements of the offense in jury-instruction fashion as follows:

> 1. On or about July 31, 2019, in Woodbury County, Iowa, Defendant Douglas St. Cyr did an act which was specifically intended to:
>     a. cause pain or injury to [the officer];
>     b. result in physical contact which would be insulting or offensive to [the officer];
>     c. place [the officer] in fear of immediate physical contact which would be painful, injurious, or offensive to [the officer].
> 2. Defendant Douglas St. Cyr had the apparent ability to do the act.
> 3. [The officer] was a peace officer at that time.
> 4. Defendant Douglas St. Cyr knew [the officer] was a peace officer at the time he committed the act.[4]

---

[4] As previously noted, the district court found the State failed to prove this element, so found St. Cyr guilty of the lesser-included offense of assault with a dangerous weapon.

> 5. In committing the act, Defendant Douglas St. Cyr used a dangerous weapon.

St. Cyr does not challenge the accuracy of these elements, so they become the law of the case. *See State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009) (holding when no objection is made to the jury instructions, the instructions become the law of the case for purposes of conducting our sufficiency-of-the-evidence review). St. Cyr contends the State failed to prove the first element because he lacked specific intent to cause pain or injury to the officer, cause physical contact that would be insulting or offensive to the officer, or place the officer in fear of immediate physical contact that would be painful, insulting, or offensive to the officer.[5]

To address this issue, some additional facts need to be provided. Viewed in the light most favorable to the district court's guilty finding, the testimony and dash camera video evidence established law enforcement received a tip of St. Cyr's whereabouts, so a team of officers in multiple vehicles began looking for St. Cyr to execute the outstanding warrant for his arrest. Their search led them to focus on a particular sport utility vehicle (SUV) believed to be driven by St. Cyr. The team of officers began tracking it. The driver of the SUV began making seemingly random turns and taking other actions that appeared to be designed to determine whether the SUV was being followed. The officers eventually confirmed St. Cyr was driving the SUV and formulated a plan to stop St. Cyr that considered St. Cyr's history of eluding. The plan was ultimately executed by a marked patrol vehicle following behind St. Cyr's SUV as it approached a stop sign at a t-

---

[5] For ease of reference, we will refer to these alternative forms of conduct that would satisfy the first element as "assaultive conduct."

intersection. As St. Cyr approached the stop sign, an undercover officer in an unmarked van pulled in front of St. Cyr's SUV very quickly and stopped, boxing the SUV between the van and the following marked patrol vehicle. Rather than remain stopped at the stop sign, St. Cyr accelerated the SUV, ramming it into the driver's side door of the unmarked van. At that point, the front seat passenger in the SUV jumped out and took off running and the officer in the marked patrol vehicle following the SUV activated its lights. The plainclothes officer driving the unmarked van opened the door to the van and began to exit while St. Cyr put the SUV in reverse, backed up a few feet, placed the SUV back in drive, and rammed the SUV into the side of the van a second time. After colliding with the van, St. Cyr drove the SUV over the curb, turned the corner, and fled the scene. He was later captured after abandoning the SUV.

St. Cyr claims his collisions with the van were merely efforts to leave the scene and were not intended to be assaultive conduct. In support of this claim, he relies heavily on our decision in *State v. Bartlett*, No. 17-1170, 2018 WL 3301830, at *6 (Iowa Ct. App. July 5, 2018). In *Bartlett*, our court determined the evidence was insufficient to prove the defendant had the requisite intent to commit assault with a dangerous weapon on a peace officer when he ran into an officer's vehicle while engaged in a vehicle chase. 2018 WL 3301830, at *6. In making that determination, our court found the defendant was trying to evade the officers, and hitting the patrol car with the defendant's own vehicle was incidental to the defendant's attempt to flee rather than being a product of aggressive driving. *Id.*

St. Cyr contends his situation is similar to the facts in *Bartlett* and the district court erred in finding he intended to engage in assaultive conduct. We disagree.

Unlike in *Bartlett*, St. Cyr took his vehicle from a fully stopped position to driving directly into the driver's side of the van in front of him. After that, the plainclothes officer driving the van began to exit the vehicle out the driver's side, putting the officer in an exposed position. Despite the driver's exposed position, St. Cyr backed up and then accelerated forward directly into the driver's side of the van a second time, exposing the exiting officer to sufficient fear of contact that the officer fired his firearm at St. Cyr. Under these circumstances, we conclude substantial evidence supports the district court's finding that St. Cyr intended assaultive conduct, so we reject St. Cyr's challenge to the sufficiency of the evidence on the assault with a dangerous weapon charge.

### 3. Compulsion and Necessity Defenses

St. Cyr contends the district court erred in finding he did not act out of necessity or compulsion when he rammed the van and left the scene of the accident. We will address the two defenses separately.

The defendant has the burden of generating a fact question on the necessity defense. *State v. Walton*, 311 N.W.2d 113, 115 (Iowa 1981). If the defendant generates a fact question on the defense, the State has the burden of disproving the defense beyond a reasonable doubt. *Id.* The necessity defense only applies "in emergency situations where the threatened harm is immediate and the threatened disaster imminent. The defendant must be stripped of options by which he or she might avoid both evils." *Id.* Suggested factors to consider in deciding whether the necessity defense applies include: "(1) the harm avoided, (2) the harm done, (3) the defendant's intention to avoid the greater harm, (4) the relative value of the harm avoided and the harm done, and (5) optional courses of action and the

imminence of disaster." *Id.* Further, the defendant must not have acted in a manner to bring about the situation at issue. *Id.*

St. Cyr failed to generate a fact question on a necessity defense. The only reasonable interpretation of the facts presented at trial is that St. Cyr created the situation that he claims called for him to ram the van and flee the scene. St. Cyr faced no threatened harm when the van stopped in front of the SUV he was driving. Facing no harm himself, St. Cyr chose to create a situation of great potential harm by ramming the van twice. St. Cyr could have simply waited once the van stopped in front of him, and he could have been arrested without incident. St. Cyr's claim that he had to ram the van and flee the scene because he was being shot at is not persuasive, as the shot was fired only once it became clear St. Cyr intended to ram the van a second time on the driver's side while the plainclothes officer was exiting the vehicle. In short, St. Cyr was not stripped of options that would have required him taking the actions he took, so the necessity defense did not apply.

As to St. Cyr's compulsion defense, we note the defense "limits liability for an otherwise criminal act when a defendant is 'compelled to [act] by another's threat or menace of serious injury, provided that the person reasonably believes such injury is imminent and can be averted only by the person doing such act.'" *State v. Hannegrefs*, No. 18-1419, 2019 WL 2524154, at *2 (Iowa Ct. App. June 19, 2019) (alteration in original) (quoting Iowa Code section 704.10). As with the defense of necessity, St. Cyr has the burden to generate a fact question on the compulsion defense, and then the burden shifts to the State to disprove it beyond a reasonable doubt. *See State v. Walker*, 671 N.W.2d 30, 34 (Iowa Ct. App. 2003).

A defendant asserting a compulsion defense must generate a fact question by proof of four elements:

> 1. defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;
> 2. that defendant had not recklessly or negligently placed [the defendant] in a situation in which it was probable that [the defendant] would be forced to commit a criminal act;
> 3. that the defendant had no reasonable, legal alternative to violating the law; and
> 4. that a direct causal relationship may be reasonably anticipated between the commission of the criminal act and the avoidance of the threatened harm.

*Id.* at 35. For many of the same reasons St. Cyr failed to generate a fact question on the necessity defense, he also failed to generate a fact question on the compulsion defense. St. Cyr was under no threat, let alone a well-grounded apprehension of death or serious bodily injury, and he had reasonable, legal alternatives before he assaulted the driver of the van. It was St. Cyr's assault with a dangerous weapon that caused a gunshot to be fired at St. Cyr, not the other way around.

Further, even if we assumed for the sake of argument St. Cyr generated a fact question on the compulsion defense, his defense fails by operation of the statute creating it. Iowa Code section 704.10 states:

> No act, *other than an act by which one intentionally or recklessly causes physical injury to another*, is a public offense if the person so acting is compelled to do so by another's threat or menace of serious injury, provided that the person reasonably believes that such injury is imminent and can be averted only by the person doing such act.

(Emphasis added.) Besides the fact there is no evidence St. Cyr was subject to a threat of serious injury before he assaulted the van driver, in committing the

assault, St. Cyr intentionally or recklessly caused the van driver's leg to be pinned in the door jam and injured. This is a physical injury to the victim that, by operation of the statute, makes the compulsion defense inapplicable.

We end our discussion of the defenses by noting neither the necessity nor compulsion defense applies to overcome St. Cyr's conviction for leaving the scene of a personal injury accident. As noted by the district court, section 321.261 does not require a person to stop the vehicle at the scene of the accident. The statute permits stopping "as close as possible." Additionally, the statute requires a person to return to the scene of the accident if able. Therefore, even if we accepted St. Cyr's claim that being shot at created necessity or compulsion to leave the scene, he was not prevented from returning to the scene as required.

## III.    Conclusion

The district court properly denied St. Cyr's motion to suppress evidence stemming from the stop of his vehicle in the first case. In the second case, there is substantial evidence supporting the district court's findings of guilt on the challenged charges, and St. Cyr failed to generate fact questions on his necessity and compulsion defenses.

**AFFIRMED.**

Bower, C.J., concurs; Tabor, J., partially dissents.

**TABOR, Judge** (concurring in part and dissenting in part.)

I respectfully dissent from the majority's ruling on the motion to suppress. Assuming the officer's stop of St. Cyr's Chevy Malibu for failure to have permanent license plates was a reasonable mistake of fact, the officer's failure to check the back window for proof of temporary registration unreasonably extended the detention. *See State v. Salcedo*, 935 N.W.2d 572, 580 (Iowa 2019).

Officer Jordan Burns testified that before he signaled for St. Cyr to stop, he was able to see "some sort of a dealer advertisement paper plate" on the rear of the Malibu. But after the stop—which was premised solely on suspicion of a registration violation under Iowa Code section 321.37 (2018)—the officer did not bother to look at the back window to see if the Malibu's owner had applied for registration under section 321.25. Indeed, St. Cyr was not violating section 321.37 because the Malibu displayed a valid Nebraska in-transit sticker.

The defense offered this exhibit to show the visibility of the in-transit sticker. At the suppression hearing, defense counsel cross examined Officer Burns,



asking: "Do you know why you did not see that in-transit sticker seen in Exhibit 4?" The officer responded: "Because I was continually watching the driver, checking for any movements or anything like that for officer safety purposes." Defense counsel followed up: "[I]f you had looked at the back of that Chevy Malibu, you would have seen the

in-transit sticker if you had not just kept your eyes on the driver, correct?" The officer answered: "Potentially." The officer went on to testify that he did not notice the in-transit sticker until after he had asked St. Cyr for his driver's license. When St. Cyr reached for his license, the officer could see a baggie that he suspected held drugs near the driver's leg. The officer seized that contraband.

In denying the motion to suppress that evidence, the district court credited Officer Burns's explanation for not seeing the in-transit sticker, citing *United States v. Mendoza*, 691 F.3d 954 (8th Cir. 2012). But this case is different. The circuit court rejected Mendoza's assertion that it was "implausible on its face" that the officer did not look for a temporary tag when approaching his car because she was trying to "make sure that nobody has a weapon, nobody is fleeing the vehicle, nobody is making any furtive movements in the front seat or the back seat, ascertain how many passengers there are, et cetera." *Mendoza*, 691 F.3d at 958. The circuit court held that testimony was not "inherently implausible" especially because the "occupants were under investigation by the Drug Enforcement Administration." *Id.*

By contrast, Officer Burns testified his only reason for stopping the Malibu was the lack of license plates. St. Cyr was the only person in the car. Officer Burns did not articulate any reason to believe St. Cyr was dangerous. True, "officer safety is a legitimate and weighty interest in the context of traffic stops." *State v. Coleman*, 890 N.W.2d 284, 300 (Iowa 2017). But "in cases where officer safety has been raised, the courts have repeatedly rejected generalized, unsubstantiated claims related to officer safety as a basis for extending a traffic stop." *Id.* at 301; *see also United States v. Henderson*, 463 F.3d 27, 45–47 (1st Cir. 2006) (rejecting

conclusory argument of officer safety); *United States v. Smith*, 37 F.Supp.3d 806, 812–13 (M.D. La. 2014) (finding insufficient evidence of safety threat to justify extended stop)..  And if the officer can resolve the reason for the stop by checking the back window without engaging in close interaction with the driver, the risk to the officer may be lessened, not increased.  *See id.*

Beyond the invocation of officer safety, both the district court and the majority rely on *State v. Lloyd*, 701 N.W.2d 678, 681 (Iowa 2005), for the proposition that an officer's failure to see a valid temporary registration sticker does not render an investigatory stop invalid if the mistake of fact was objectively reasonable.  But *Lloyd* tracked *State v. Jackson*, 315 N.W.2d 766, 767 (Iowa 1994), which our supreme court overruled in *Coleman*, 890 N.W.2d at 301.  The majority asserts *Coleman* overruled *Jackson* "on other grounds."  That assertion overlooks the interface between the grounds for the initial stop and the grounds for a continued detention.  *Lloyd* addressed only the officer's reason for the initial stop. 701 N.W.2d at 681–82 (holding it was "certainly understandable" that officer could have missed the temporary plate when deciding to stop Lloyd's car at 2:20 a.m.). In its fact section, the opinion stated that when the officer approached the driver's side window, he saw Lloyd had "red, watery eyes and smelled of alcohol."  *Id.* at 679.  But the opinion did not recite whether the officer noticed Lloyd's temporary plate before or after seeing signs of his intoxication.  So *Lloyd* includes no discussion of the grounds for continuing detention.  That dispute was dissected a decade later in *Rodriguez v. United States*, 575 U.S. 348 (2015), and *In re Property Seized from Pardee*, 872 N.W.2d 384 (Iowa 2015).

In my view, it is time for a reckoning between *Lloyd* and the *Rodriguez*/*Pardee*/*Coleman* line of cases. I would question whether *Lloyd* remains good law after *Coleman.* Although the *Coleman* majority does not address the ongoing force of *Lloyd,* the dissent bemoans its demise: "Under the majority's new regime, after noticing the validly displayed plate, the officer could only wave on the driver, permitting someone like Lloyd to drive away drunk . . . ." *Coleman*, 890 N.W.2d at 308 (Waterman, J., dissenting).

But even if *Lloyd* retains some vitality, it cannot stand alone to justify Officer Burns's seizure of the contraband. To determine the reasonableness of the seizure, we must employ a dual inquiry: (1) was the officer's conduct justified at its inception and (2) was the conduct "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968); *see United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) (holding initially valid stop based on suspicion of registration violation evolved into unreasonable detention); *but see Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (allowing questioning on matters unrelated to justification for stop "so long as those inquiries do not measurably extend the *duration* of the stop" (emphasis added)). At most, *Lloyd* answers the first inquiry. The *Rodriguez*/*Pardee*/*Coleman* line of cases moves us to the second inquiry.

When analyzing the grounds for continuing detention, *Coleman* emphasized an investigatory stop "must be carefully tailored to its underlying justification" and "last no longer than is necessary to effectuate the purpose of the

stop."[6]  890 N.W.2d at 288 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Rodriguez*, 575 U.S. at 354 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (in determining reasonable duration of stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation")); *see People v. Bass*, ___ N.E.3d ___, ___, 2021 WL 1416599, at *5 (Ill. 2021) (finding State did not show asking for driver's license was reasonably related to resolving red light violation, as opposed to "detouring investigation, which prolonged the stop").  Here, Officer Burns did not tailor his investigation to the purpose for the stop when he made no effort to look for the in-transit sticker. The officer did not diligently pursue his investigation of the registration violation. Instead, the officer veered into a "detouring investigation," which unconstitutionally prolonged the stop.

As the defense argued at the suppression hearing, "it comes down to whether or not it was objectively reasonable for the officer to not identify this in-transit sticker . . . until after his initial verbal contact with the defendant."  And as St. Cyr added on appeal, "the paper advertisement dealer plate should have provided ample notice to look for the dealer in-transit plate" even before—but certainly after—pulling over the Malibu.  *See United States v. McLemore*, 887 F.3d 861, 866 (8th Cir. 2018) (affirming order granting motion to suppress when officer knew BMW she stopped for a registration violation had "a car dealer's advertising

---

[6] Recently, our supreme court reiterated that an investigatory stop must not go beyond the mission of addressing the traffic infraction and related safety concerns. *Salcedo*, 935 N.W.2d at 578.

plate where the rear license plate is customarily attached" though she was unable to see the letters or numbers on paper plate in the window).

It was not objectively reasonable for Officer Burns to question St. Cyr and ask for his driver's license, when a less intrusive option was available to resolve the ambiguity of the potential registration violation. The officer acknowledged he had the potential to see the valid in-transit sticker had he not focused exclusively on St. Cyr when approaching the driver's window. Plus, the dealer advertisement should have nudged the officer to look for a temporary registration sticker. It was not reasonable for the officer to adopt a head-in-the-sand approach to his investigation of the registration violation when a quick glance at the back window would resolve the question. To do so would parlay a stop based on a reasonable mistake of fact into a prolonged seizure without probable cause.

On this record, I would reverse the denial of the motion to suppress and remand for further proceedings on St. Cyr's convictions for possession of methamphetamine and driving while barred. I concur on the remaining issues. True, St. Cyr's convictions for failure to appear, assault with a dangerous weapon, leaving the scene of an accident, possession of ammunition, and driving while suspended stemmed from those two original convictions. But he does not assert that a suppression ruling in his favor would have affected the later convictions. *Cf. State v. Dawdy,* 533 N.W.2d 551, 555 (Iowa 1995) (holding even if initial arrest is unlawful, defendant has no right to resist).